UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------x
M.R., individually and on behalf of, S.T., a child with a
disability,

                                        Plaintiffs,

                    - against -

SOUTH ORANGETOWN CENTRAL SCHOOL
DISTRICT,

                                        Defendant.
----------------------------------------------------------------------x

**OPINION AND ORDER**

No. 10-CV-1800 (CS)

<u>Appearances:</u>
Andrew K. Cuddy
Law Office of Andrew K. Cuddy
Auburn, New York
*Counsel for Plaintiffs*

Mark C. Rushfield
Shaw, Perelson, May & Lambert, LLP
Poughkeepsie, New York
*Counsel for Defendant*

<u>Seibel, J.</u>

  Before the Court are Defendant's Motion for Summary Judgment, (Doc. 8), and

Plaintiffs' Cross-Motion for Summary Judgment, (Doc. 13).  Plaintiff M.R. ("MR") brings this

action on behalf of her minor son Plaintiff S.T. ("ST") pursuant to the Individuals with

Disabilities Education Act ("IDEA"), 20 U.S.C. § 1415(i)(2), Section 504 of the Rehabilitation

Act of 1973, 29 U.S.C. § 794, and Article 89 of the New York State Education Law, N.Y. Educ.

Law §§ 4401–4410-b, against Defendant South Orangetown Central School District ("the

district").  Plaintiffs seek review of an administrative decision by a State Review Officer

("SRO") at the New York State Education Department ("SED") upholding the administrative

decision of an Impartial Hearing Officer ("IHO").  The IHO held that (1) ST's classification as other health impaired ("OHI"), rather than autistic, was appropriate; (2) the district provided ST with a free, appropriate public education ("FAPE") for the 2007–08 school year; (3) the district did not provide ST with a FAPE for the 2008–09 school year; and (4) despite the failure of the district in the 2008–09 school year, Plaintiffs were not entitled to an equitable remedy, such as compensatory services, because MR defeated the district's ability to properly accommodate ST. (*See generally* IHO Decision.)[1]  The SRO agreed with the IHO on all four issues, but held that Plaintiffs were not entitled to the equitable remedy they sought for different reasons—namely, that they had failed to timely request such relief and the record did not reflect a deprivation of educational services that could be remedied by a compensatory education award.  (*See generally* SRO Decision.)[2]

Plaintiffs seek an order reversing the SRO decision and providing an equitable remedy to compensate ST for deprivation of instruction.  Defendant seeks an order upholding the SRO decision and dismissing Plaintiffs' complaint.  For the reasons set forth below, the Court grants Defendant's Motion for Summary Judgment and denies Plaintiffs' Cross-Motion for Summary Judgment.

I.     **BACKGROUND**

The following facts are undisputed except where noted.

ST is a child with a host of physical, mental, and emotional maladies, including "a learning disability, a seizure disorder, possible bipolar disorder, anxiety issues, attentional and

---

[1] "IHO Decision" refers to the Findings of Fact and Decision of IHO Susan C. Lushing, dated September 1, 2009. Citations to documents that form part of the administrative record relate to hard copy documents that the Court received from the SED in late October 2011.  The SED's delay in providing those documents, for which no adequate explanation has been provided, greatly delayed the resolution of this case.  The Court would hate to have to resort to contempt remedies to obtain administrative records in a timely fashion in the future.
[2] "SRO Decision" refers to the Decision of SRO Paul F. Kelly, dated December 14, 2009.

working memory deficits, processing speed deficits, sensory motor deficits, impaired stamina and low frustration tolerance," as well as Asperger's Syndrome, a subcategory of autism. (D's 56.1 ¶ 5.)[3]  In June 2003, when ST was in fourth grade, the district classified him as a student with a learning disability, and has provided him educational supports since that time. (*Id.* ¶¶ 2–3.)  ST's classification remained unchanged until June 2008 when the district changed it to OHI. (*Id.* ¶ 3.)

As ST was aging into middle school, he was placed in the district's Keys for Educational Achievement ("KEA") program, which is located in the district's middle school. (*Id.* ¶ 6.)  KEA is designed to accommodate students who are not succeeding in the normal channels of the district's programs by providing a ratio of twelve students to one teacher and one teaching assistant (12:1:1). (*Id.* ¶ 7.)  The intent of KEA is to provide supports, specifically for reading and math, to such students so that after sixth and seventh grades, they may transition to 15:1 special class programs for eighth grade that prepare them for integrated and 15:1 special classes at the district's high school. (*Id.* ¶ 8.)  Plaintiffs contend that this "one-size-fits-all design was not specifically designed to meet S.T.'s needs, and failed to do so." (Ps' 56.1 ¶ 8.)[4]  For students who would not be successful in the 15:1 program in eighth grade, the district generally locates out-of-district placements, as there is no KEA-like program in the high school. (D's 56.1 ¶ 10.)

KEA students are reviewed yearly by the Committee on Special Education ("CSE") to determine their progress.  At ST's April, 24, 2006 annual review, when he was in sixth grade, the CSE determined, with resistance from MR, that ST was doing well enough to introduce him to a 15:1 special class for math. (D's 56.1 ¶ 11; Ps' 56.1 ¶ 11.)  At a June 14, 2006 meeting, however, the CSE placed him back in the KEA-supported math class. (D's 56.1 ¶ 11.)

---

[3] "D's 56.1" refers to Defendant's Rule 56.1 Statement in Support of Motion for Summary Judgment. (Doc. 9.)
[4] "Ps' 56.1" refers to Plaintiffs' Response to Statement of Material Facts Not in Dispute. (Doc. 16.)

At a June 20, 2007 CSE meeting, ST's KEA teacher reported that he had passed all seventh grade subjects and that, in her view, he was ready for the eighth grade component of the KEA model, which would help determine whether ST could be successful in mainstream high school classes or if an out-of-district placement would be necessary.  (*Id.* ¶ 12.)  At this meeting, MR requested, for the first time since a Fall 2005 Asperger's diagnosis, that ST's classification be changed from learning disabled to a student with autism, and that the CSE place ST in the therapeutic support program ("TSP") in the district or look for an out-of-district placement.  (*Id.* ¶¶ 13, 15.)  MR did not, however, provide documentation to the CSE to support her request for reclassification.  (*Id.* ¶ 17.)  Furthermore, MR's request was in tension with reviews of a specialist, with whom MR consulted, who opined that an IDEA classification of OHI with a notation of Asperger's was more appropriate than an autism classification.  (*Id.*)  Ultimately, the CSE:  (1) recommended an eighth grade program comprised of 15:1:1 special class support in math, science, and social studies; (2) supplied ST with 1.5 hours per day of KEA support, counseling, occupational therapy, program modifications, and testing accommodations; and (3) made a determination, because it lacked the requisite documentation, that a reclassification to autism was inappropriate.  (*Id.* ¶ 18.)

ST's eighth grade year proved to be very difficult for him, and the district recommended, consistent with MR's previous request, that it look for an out-of-district placement for ST.  (*Id.* ¶ 19.)  MR signed consent forms to release ST's records to out-of-district placements on December 3, 2007, (*id.* ¶ 20), but revoked her consent within the hour in order to get more information, (Ps' 56.1 ¶ 20).  After several attempts to schedule a meeting with the district concerning out-of-district placements, a meeting occurred on December 19, 2007.  (D's 56.1 ¶¶ 22–23.)  At the meeting, MR read a letter to the district's representatives that stated that she would only provide

consent to potential out-of-district placements if changes—including a reclassification to autistic—were made to ST's 2007–08 Individualized Education Program ("IEP").  (*Id.* ¶¶ 24–25.)  The district clarified that it did not need MR's consent to send out-of-district placement packets, but that it desired to have the search process be collaborative.  (*Id.* ¶ 26.)  Although no agreement was reached at the meeting as to where the out-of-district placement packets would be sent, (*id.*), the district nonetheless sent them to certain potential placements that had previously been identified to MR.  (*Id.* ¶ 29.)

As is customary for out-of-district placements, MR was contacted by the Board of Cooperative Educational Services ("BOCES") and advised that she would have to produce ST for intake at each of the potential placements.  (*See id.* ¶ 30.)  The district sent follow-up letters to MR on January 29, 2008, and February 19, 2008, in which it enclosed information regarding the potential programs that had previously been forwarded to MR on December 4, 2007.  (*Id.* ¶¶ 32, 35.)  The district reminded MR that ST had to be present for intake for an out-of-district placement to be made.  (*Id.* ¶¶ 32, 35.)  MR had to cancel some scheduled meetings with certain placements because of problems at work and because her other son got sick.  (*See id.* ¶¶ 36–42.)  Although MR visited two programs in February and March, she did so without ST, and did not take ST to participate in a "full intake" until June 2008, when she brought him to the West Nyack Rockland BOCES program, the Learning Center at Walden at Putnam/Northern Westchester BOCES, and the Karafin School.  (*See id.* ¶¶ 30, 44.)[5]  MR agreed that ST's presence was necessary for intake purposes, but believed that it was unnecessary for him to attend intake at programs she thought were inappropriate, and she was unwilling to take ST out of school to visit a program that was not a good fit.  (Ps' 56.1 ¶¶ 31, 44, 45.)  To MR's mind, the

---

[5] Obviously by this time it was too late for a placement for the 2007–08 school year, and the district had shifted its focus to the 2008–09 school year.  (D's 56.1 ¶ 45.)

district never identified an appropriate placement, did not vet programs before sending out applications, and thus only demanded that she visit placements that did not meet ST's needs. (*Id.* ¶ 45.)

Unbeknownst to the district, MR sent out-of-district placement materials to the Forum School, an out-of-state private school, which on April 28, 2008 notified her that ST was accepted for immediate placement for the remainder of the 2007–08 school year.  (D's 56.1 ¶ 46.)  By e-mail on April 30, 2008, MR advised the district that she had "ruled out" the "only two programs" recommended by it, that the Forum School was an appropriate placement, and that the district should forward ST's records there.  (*Id.* ¶ 48.)  In a May 20, 2008 letter, the district notified MR that it was required to pursue all New York placements before it looked into out-of-state programs for ST.  (Parent's Exhibit 49 at 1.)  If the district could not find an appropriate program in the state, it "would then have to show such documentation to NYSED and they would then provide [the district] with the necessary approval to pursue out of state programs such as The Forum School."  (*Id.*)  MR informed the district over the summer that ST had already been accepted at the Forum School, after which the district applied on ST's behalf for the 2008–09 school year, but ST was then rejected by the Forum School because he was inappropriate for one program, and another, which fit his needs, was full.  (D's 56.1 ¶ 49; Ps' 56.1 ¶ 49.)

The district held additional meetings and traded correspondence with MR concerning ST's out-of-district placement—including sending her a list of state-approved schools and inviting her input—but the parties did not reach an agreement.  (*See generally* D's 56.1 ¶¶ 50–53.)  On June 5, 2008, the CSE conducted a review for ST's 2008–09 school year, during which it recommended changing ST's classification from learning disabled to OHI "[b]ased upon S.T.'s co-morbid features of epilepsy, seizure activity, learning difficulties in reading, writing, and

mathematics, sensory motor difficulties, Asperger's Disorder and emotional and attentional difficulties." (*Id.* ¶ 54.) MR disagreed and noted that she wanted his classification changed to autism, which the CSE did not support. (*Id.* ¶ 55.) Between June 2008 and July 2008, as noted, MR and ST participated in intake at three of the five potential schools discussed at a May 12, 2008 CSE meeting. (*Id.* ¶ 56.) On July 7, 2008, MR wrote an e-mail to the district indicating that the district's out-of-district placement recommendations were "sorely inappropriate," and she refused to meet with one placement for the same reason. (*Id.* ¶¶ 57–58.) At ST's July 15, 2008 program review, the district recommended a placement at the BOCES High School at West Nyack, a suggestion that MR rejected because the program was geared toward emotionally disturbed and chemically-dependent children. (*Id.* ¶ 59; Ps' 56.1 ¶ 59.)

On September 11, 2008, MR filed a due process complaint notifying the district of her disagreement with ST's classification, 2008–09 IEP, services, placement, and program, and stating that the district had failed to offer ST a FAPE in both the 2007–08 and 2008–09 school years for many reasons. (*See* D's 56.1 ¶ 62.) Plaintiff made a variety of requests for relief in her due process complaint, (*see id.* ¶ 63), but did not include a request for compensatory education as a remedy, (*id.* ¶ 64).

The IHO, Susan Lushing, commenced impartial hearings on November 13, 2008 and heard argument and testimony over eleven days through June 16, 2009. (*Id.* ¶ 67.) In a thirty-six-page, double-spaced decision, the IHO concluded that (1) ST was properly classified as OHI given the combination of disorders and disabilities he faced; (2) the recommendation to place ST in the KEA program for eighth grade provided a FAPE; (3) by not bringing ST for intake at potential placements, MR did not display a sense of urgency or participate in the process; (4) the district had acted promptly to find an out-of-district placement for ST for 2007–08, and any

denial of educational services that year was attributable to delays caused by MR; (5) the district

failed to offer ST a FAPE for the 2008–09 school year because the evidence failed to show that

the West Nyack placement would have addressed the Asperger's component of ST's disabilities,

but it was MR who reduced the district's recommendations down to this sole option, and

therefore she "effectively defeated most of the possibilities"; (6) because of MR's contribution to

the situation, ST was not entitled to any equitable remedy such as compensatory services; and (7)

the case was not moot as to the years that had already ended because the parties deserved a

conclusion on the merits.  (*Id.* ¶¶ 70–77.)

The parties cross-appealed to the SRO.  In a twenty-six-page, single-spaced opinion, the

SRO held that plaintiffs' claims as to the 2007–08 and 2008–09 IEPs were moot because the

respective school years had already ended.  (*Id.* ¶ 80.)  In the alternative, he adopted the IHO's

findings of fact and conclusions of law, with the exception of the rationale asserted for declining

to award compensatory educational services.  (*Id.* ¶ 84.)  The SRO instead held that Plaintiffs

could not raise the request for compensatory educational services as relief for the first time in

their closing brief to the IHO, and that the need for such services was not supported by the

record.  (*Id.* ¶¶ 81–82.)

## II.    APPLICABLE LEGAL STANDARDS

The IDEA was enacted to promote the education of children with disabilities.  *See, e.g.*,

*Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998) (quoting *Bd. of Educ. of*

*Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 179 (1982)).  Under the statute,

states that receive federal funding must provide disabled children with a FAPE, 20 U.S.C. §

1412(a)(1), which includes "special education and related services" tailored to meet the unique

needs of the particular child, *id.* § 1401(a)(18), and "'reasonably calculated to enable the child to receive educational benefits,'" *Walczak*, 142 F.3d at 122 (quoting *Rowley*, 458 U.S. at 207).

"The 'centerpiece of the statute's education delivery system' is the IEP, an educational program tailored to provide appropriate educational benefits to individual disabled students." *Viola v. Arlington Cent. Sch. Dist.*, 414 F. Supp. 2d 366, 377 (S.D.N.Y. 2006) (quoting *Honig v. Doe*, 484 U.S. 305, 311 (1988)). The IEP must be developed annually by "[a] school official qualified in special education, the child's teacher, the child's parents, and, where appropriate, the child." *Walczak*, 142 F.3d at 122. The IDEA sets forth procedural and substantive requirements for IEPs, *see* 20 U.S.C. § 1414, but "does not itself articulate any specific level of educational benefits that must be provided through an IEP," *Walczak*, 142 F.3d at 130. Courts interpreting the IDEA make clear, however, that a school district is not required to "furnish[] . . . every special service necessary to maximize each handicapped child's potential," *Rowley*, 458 U.S. at 199 (interpreting the Education for All Handicapped Children Act, the predecessor to the IDEA), but rather a "district fulfills its substantive obligations under the IDEA if it provides an IEP that is likely to produce progress, not regression, and if the IEP affords the student with an opportunity greater than mere trivial advancement," *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 195 (2d Cir. 2005) (internal quotation marks omitted). The "services must be provided in the least restrictive setting consistent with a child's needs." *Walczak*, 142 F.3d at 122. Thus, the education provided must "be sufficient to confer some educational benefit upon the handicapped child," *Rowley*, 458 U.S. at 200, but it need not "provide[] everything that might be thought desirable by loving parents," *Walczak*, 142 F.3d at 132 (internal quotation marks omitted).

New York's regulations implementing the goals of the IDEA "appear to track the IDEA closely." *Bd. of Educ. v. O'Shea*, 353 F. Supp. 2d 449, 454 (S.D.N.Y. 2005); *see* N.Y. Educ.

Law §§ 4401–4410-b.  Parents who are dissatisfied with a proposed IEP may request an impartial hearing before an IHO.  *See* N.Y. Educ. Law § 4404(1).  Following that hearing, the losing party may appeal to a SRO.  *See Student X v. N.Y.C. Dep't of Educ.*, No. 07-CV-2316, 2008 WL 4890440, at *2 (E.D.N.Y. Oct. 30, 2008); 20 U.S.C. § 1415(g).  Once this administrative process is exhausted, a party may file a civil action in federal or state court challenging the administrative decision.  *See* 20 U.S.C. § 1415(i)(2)(A); N.Y. Educ. Law § 4404(3).

Motions for summary judgment customarily resolve IDEA actions in federal court.  *See Antonaccio ex rel. Alex v. Bd. of Educ. of Arlington Cent. Sch. Dist.*, 281 F. Supp. 2d 710, 714 (S.D.N.Y. 2003).  Under the IDEA, unlike in the usual case, the existence of a disputed issue of fact will not defeat the motion.  *Id.*  Rather, summary judgment "is a pragmatic procedural mechanism for reviewing administrative decisions."  *T.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009) (internal quotation marks omitted).  In a review action pursuant to 20 U.S.C. § 1415(i) of the IDEA, the district court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(C); *see Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 380 (2d Cir. 2003).

In deciding the motion, the court undertakes what "has been characterized as modified *de novo* review."  *C.B. ex rel. W.B. v. N.Y.C. Dep't of Educ.*, No. 02-CV-4620, 2005 WL 1388964, at *12 (E.D.N.Y. June 10, 2005) (internal quotation marks omitted).  The district court must engage in an independent review of the administrative record and make a determination based on a preponderance of the evidence, but its review of state administrative decisions is limited.  *See*

*Rowley*, 458 U.S. at 205–06; *Walczak*, 142 F.3d at 129. "While federal courts do not simply rubber stamp administrative decisions, they are expected to give due weight to these proceedings, mindful that the judiciary generally lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *Walczak*, 142 F.3d at 129 (alteration in original) (internal quotation marks omitted). Such deference to the final decision of state authorities is appropriate even where the SRO disagrees with the IHO, *see A.C. ex rel. M.C. v. Bd. of Educ. of Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 171 (2d Cir. 2009), particularly where the SRO's "review has been thorough and careful," *Walczak*, 142 F.3d at 129. Reviewing courts should be mindful that they are not "to substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206. Further, in order to avoid "impermissibl[y] meddling in state educational methodology," the court should look for objective evidence as to whether the child is likely to progress or regress under the proposed plan. *Mrs. B. ex rel. M.M. v. Millford Bd. of Educ.*, 103 F.3d 1114, 1121 (2d Cir. 1997).

## III.   DISCUSSION

For the reasons set forth below, I find the SRO's decision to be supported by a preponderance of the evidence in the record and see no reason to disturb it.

### A.   OHI Classification

The IHO found, and the SRO agreed, that the district appropriately classified ST as OHI rather than autistic. (*See* IHO Decision 29–31; SRO Decision 19, 25.) The IHO accepted testimonial and documentary evidence regarding whether ST had been properly deemed OHI, and determined that the classification was proper for a variety of reasons.

11

First, Defendant set forth evidence from various professionals—ST's teacher for three years in the KEA program, a school psychologist who provided counseling and social training sessions to ST, and a psychiatrist who worked with ST for approximately five years and was the first to diagnose ST with Asperger's—that showed that ST was a child affected by "complex medical, neurological and emotional issues." (*See* IHO Decision 11–17, 29.) Although each of these professionals agreed that Asperger's was one of the health impairments that ST faced, they concluded that it was not his primary disability and, therefore, that he was best served by the more holistic OHI classification. (*See generally id.* 11–17 (discussing the evidence submitted by S.N., S.S., and Dr. Mallenbaum).) The IHO gave due weight to the findings of Dr. Mallenbaum, the psychiatrist who originally diagnosed ST with Asperger's, who determined that ST was not a child who was deep in the autistic spectrum, and that because of ST's various other conditions a classification of OHI with an Asperger's notation was appropriate. (*Id.* 17; *see* IHO Hearing Transcript ("IHO Hr'g Tr.") 807–10.)

Second, Plaintiffs set forth testimonial and documentary evidence from two professionals—Dr. Soorya and Dr. Kolevzon—whose opinions were also accorded due weight. The IHO found that Dr. Soorya was neither an educator nor a school psychologist, and had acknowledged her unfamiliarity with IDEA classifications. (IHO Decision 30.) Dr. Kolevzon spent only a limited period of time with ST and relied heavily on Dr. Soorya's evaluation in making his diagnosis. (*Id.*) Moreover, in contrast to Dr. Mallenbaum, neither clinician made any recommendation for a specific educational classification. (*Id.* 31.)

Third, the IHO found that although Asperger's is a disorder on the autism spectrum, and a diagnosis that may be made by medical and psychological professionals, it is not an educational classification available to the CSE. (*Id.* 28.) Accordingly, the CSE could consider

Asperger's as one of the many conditions that ST faced, but such diagnosis did not control for classification purposes over any other of his conditions.  (*Id.* 29.)

On appeal, Plaintiffs claim that the administrative officers erred in finding that an autism classification was incorrect and, to that end, argue that the district's professionals who insisted that an autistic classification was improper could not come to an agreement as to which of ST's disabilities actually took precedence.  (*See* Ps' Mem. 8–10.)[6]  As the IHO determined, however, this argument cuts both ways.  Although the district's employees could not come to an agreement about ST's primary disability, it is for this very reason that the OHI classification was appropriate; at the very least, it is no reason to conclude that a classification of autism was proper.

OHI is defined as

having limited strength, vitality, or alertness, including a heightened alertness to environmental stimuli, that results in limited alertness with respect to the educational environment, that—(i) Is due to chronic or acute health problems such as asthma, attention deficit disorder or attention deficit hyperactivity disorder, diabetes, epilepsy, a heart condition, hemophilia, lead poisoning, leukemia, nephritis, rheumatic fever, sickle cell anemia, and Tourette syndrome; and (ii) Adversely affects a child's educational performance.

34 C.F.R. 300.8(c)(9).  The clinicians did not come to a consensus that ST's condition was primarily a result of Asperger's or autism, and prior to April 2008 Plaintiffs' requests for an autism classification were not accompanied by sufficient documentation.  (IHO Decision 28.)  Therefore, the overall record provides no reason to disagree with the IHO's view, with which the SRO concurred, that, considering his many conditions and disorders, ST was appropriately classified as OHI.

---

[6] "Ps' Mem." refers to Plaintiffs' Memorandum of Law in Support of their Motion for Summary Judgment.  (Doc. 15.)

B.      **FAPE Determinations**

1.      **Mootness**

The IHO and SRO decisions diverged regarding whether Plaintiffs' claims were moot

because the school years at issue had already ended and a 2009–10 out-of-district placement had

been secured.  The IHO held that, after eleven days of testimony and hundreds of documents

admitted into evidence, it would have been unfair to deprive Plaintiffs of a conclusion on the

merits as to their claim for a declaratory judgment on the IEPs for the 2007–08 and 2008–09

school years.  (*Id.* 27.)  Conversely, the SRO held that Plaintiffs' claims were moot and that the

"capable of repetition, yet evading review" exception did not apply in this case.  (SRO Decision

21–25.)

The mootness doctrine is rooted in the "case or controversy" requirement of Article III of

the United States Constitution, which requires that a live controversy exist before a court at all

times during the pendency of a litigation.  See *DeFunis v. Odegaard*, 416 U.S. 312, 316–17,

(1974) (per curiam); *Fox v. Bd. of Trs. of the State Univ. of N.Y.*, 42 F.3d 135, 139–40, 140 n.2

(2d Cir. 1994).  Whenever mootness occurs, the court—whether trial, appellate, or Supreme—

loses jurisdiction over the suit, and the case must be dismissed.  *See Fox*, 42 F.3d at 140.

Due to the changing nature of a student's IEPs from one school year to the next,

mootness "is a recurring phenomenon in students' suits to vindicate . . . rights associated with the

conditions of their education."  *Patskin v. Bd. of Educ. of Webster Cent. Sch. Dist*, 583 F. Supp.

2d 422, 428 (W.D.N.Y. 2008) (internal quotation marks omitted).  For example, courts have

found cases moot when they reached the district court after a student graduated from the school,

*see Russman v. Bd. of Educ. of Enlarged City Sch. Dist. of City of Watervliet*, 260 F.3d 114, 119

(2d Cir. 2001); there was no reasonable expectation that the child would be subjected to the

particular IEP again, *see Patskin*, 583 F. Supp. 2d at 429; the case involved questions about the qualifications of a personal aide who had resigned from her job with no prospect of rehiring, *see J.N. v. Depew Union Free Sch. Dist.*, No. 07-CV-00533, 2008 WL 4501940, at *4 (W.D.N.Y. Sept. 30, 2008); and the district never complied, and expressed no intent to comply, with the IEP that was challenged in the lawsuit, *see Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 88–89 (2d Cir. 2005).

In a very limited set of cases, a plaintiff can show that the challenged action is "capable of repetition, yet evading review," and therefore not moot, by showing that two circumstances exist simultaneously:  "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again."  *Spencer v. Kemna*, 523 U.S. 1, 17 (1998) (internal quotation marks omitted).  The Supreme Court has held, in a case arising under the IDEA's predecessor statute, the Education for All Handicapped Children Act, 91 Pub. L. No. 230, 84 Stat. 175 (1970), that the first factor is generally satisfied because judicial review of an IEP challenge invariably takes longer than the duration of a school year to complete.  *See Rowley*, 458 U.S. at 186 n.9; *Lillbask*, 397 F.3d at 85 (collecting cases).  But the Second Circuit has stated that the age of the child might be relevant in connection with the first mootness factor, because "adolescent child[ren], who ha[ve] many years of eligibility remaining . . . [can] file suit in the district court immediately upon any repeat violations," and therefore their claim would not evade review.  *Lillbask*, 397 F.3d at 85 (internal quotation marks omitted).  As to the second factor, a reasonable expectation of repetition must be "more than a theoretical possibility.  Significantly, 'mere speculation that the parties will be involved in a dispute over the same issues does not rise to the level of a reasonable expectation or demonstrated probability of recurrence.'"

*B.J.S. ex rel. N.S. v. State Educ. Dep't/Univ. of State of N.Y.*, No. 08-CV-513A, 2011 WL

4368545, at *9 (W.D.N.Y. Sept. 19, 2011) (quoting *Russman*, 260 F.3d at 120).

Although the "capable of repetition, yet evading review" exception applies only in

"exceptional circumstances," *Spencer*, 523 U.S. at 17, and is "severely circumscribed," *Knaust v.*

*City of Kingston*, 157 F.3d 86, 88 (2d Cir. 1998), some courts have found that the exception

applied to certain sets of facts in IDEA cases.  For example, in *Student X*, 2008 WL 4890440,

Student X, an eleven year old child with various diagnoses of autism, pervasive developmental

disorder, tuberous sclerosis, and epilepsy, challenged the Department of Education's decision to

terminate his at-home speech and language therapy services.  *See id.* at *1, 4.  The student had

previously been involved in state administrative proceedings concerning his IEP and, despite an

IHO's prior decision recommending the at-home services, the CSE did not provide him with the

services in two consecutive IEPs.  *See id.* at *4–11.  The court found that the Department had

"consistently pursued the position that at-home services [we]re not necessary for Student X to

receive a FAPE" and had "vigorously defended" the IEPs throughout the administrative

proceedings, and therefore that the plaintiff mother "had a reasonable expectation of confronting

this controversy each year that Student X [wa]s eligible for public education."  *Id.* at *14.  The

challenge was thus capable of repetition, yet evading review.  *Id.*; *see also Heldman ex rel. T.H.*

*v. Sobol*, 962 F.2d 148, 157 n.9 (2d Cir. 1992) (even if complaint was moot, exception would

apply because child, who was pulled from school by his frustrated parents, could return there and

same dispute would arise regarding his IEP); Transcript of Oral Decision at 11–14, *M.B. v.*

*Granville Cent. Sch. Dist.*, No. 06-CV-576 (N.D.N.Y. Mar. 10, 2008) (Doc. 24) (because student

maintained interest in receiving education from district, and district continued to insist that prior

IEPs were appropriate, there was reasonable expectation that student would be subjected to same action).

The district argues that Plaintiffs limited the relief they sought to a declaratory judgment as to the 2007–08 IEP, an annulment of the 2008–09 IEP, and a new IEP for that year that reclassified him as autistic, and that because the relevant years have passed, the IEPs are no longer of value and the claims are moot.  (*See* D's Mem. 6–7.)[7]  Plaintiffs argue that the action is not moot because IDEA cases inevitably will not be reviewed during the pendency of a school year and that, here, Plaintiffs challenged ST's classification as OHI, which will be reviewed each year, making this case capable of repetition.  (*See* Ps' Mem. 21–23.)  On an independent review of the record, however, the Court finds that Plaintiffs were seeking declaratory judgment as to the IEPs for the 2007–08 and 2008–09 school years—which are obviously over and thus any declaration would be of only academic interest—and as to how ST should be classified.  The classification issue could theoretically recur, and although MR may file a subsequent lawsuit requesting review of ST's OHI classification, this Court finds that possibility merely speculative, especially because ST was placed out-of-district in a program that better suited his needs for the 2009–10 school year.  Moreover, it is not the classification *per se* that drives IDEA decision-making; rather, it is whether the placement and services provide the child with a FAPE.  *See M.H. v. N.Y.C. Dep't of Educ.*, No. 10-CV-1042, 2011 WL 609880, at *12 (S.D.N.Y. Feb. 16, 2011) (citing *Heather S. v. Wisconsin*, 125 F.3d 1045, 1055 (7th Cir. 1997)).   So MR and the district could continue to disagree on ST's classification without ST being denied a FAPE.  Accordingly, this case is unlike *Student X*, *Heldman*, and *M.B.*, and Plaintiff's claims are moot.[8]

---

[7] "D's Mem." refers to Defendant's Memorandum of Law in Support of Motion for Summary Judgment.  (Doc. 11.)
[8] While a request for compensatory services can mean that the dispute is not moot, *see Lillbask*, 397 F.3d at 90, I find, as discussed in Part C below, that such services were not properly requested in this case.  *See infra* 23–26.

2.      **Merits**

In the alternative, if this Court did have jurisdiction over the claims, it would still uphold

the SRO's decision.  The IDEA does not require the best placement for a student, but rather one

at which the student may make educational progress—that is, more than trivial advancement

rather than regression.  *See Walczak*, 142 F.3d at 130 (IDEA guarantees "appropriate"

education); *see also Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 533–34 (3d Cir. 1995) (school

district "need not provide optimal level of services, or even a level that would confer additional

benefits, since the IEP required by [the] IDEA represents only a 'basic floor of opportunity'")

(quoting *Rowley*, 458 U.S. at 201).  Furthermore, courts have held that the inquiry into whether a

particular IEP is "reasonably calculated" to confer a meaningful educational benefit on a

particular student must be made prospectively.  *See D.F. ex rel. N.F. v. Ramapo Cent. Sch. Dist.*,

430 F.3d 595, 598–99 (2d Cir. 2005) (declining to rule whether it is error to consider

retrospective evidence, but noting that the First, Third, and Ninth Circuits, as well as district

courts within the Second Circuit, had so held); *J.G. ex rel. N.G. v. Kiryas Joel Union Free Sch.*

*Dist.*, 777 F. Supp. 2d 606, 636 n.26 (S.D.N.Y. 2011) (discussing lack of Second Circuit

precedent requiring only prospective review, but ultimately conducting review limited to

information known at time IEP was crafted to reach "the most equitable result"); *J.R. ex rel. S.R.*

*v. Bd. of Educ. of City of Rye Sch. Dist.*, 345 F. Supp. 2d 386, 395 (S.D.N.Y. 2004) (courts must

"consider the propriety of the IEP with respect to the likelihood that it would benefit [the child]

at the time it was devised").  Additionally, the IDEA provides that a school district must include

and involve the parents of the disabled child in the development of that child's "educational

placement."  20 U.S.C. § 1414(e).  Parents, however, may only have input in the process; they do

not wield "veto" power over a CSE's school choice.  *See T.Y. ex rel. T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 420 (2d Cir. 2009).

a.      **2007–08 School Year**

The SRO agreed with the IHO that the district offered ST a FAPE by continuing him in the KEA program for his eighth grade year (2007–08).  (IHO Decision 31–33; SRO Decision 25.)  The IHO considered the evidence presented to the CSE, which indicated that for a child with the group of disabilities ST had, he "was essentially doing well in KEA in the seventh grade and was able to transition to the looser eighth-grade model of the program with multiple teachers, some large classes and transitions between classes."  (IHO Decision 31.)

This Court's independent review of the record demonstrates support for the administrative determination that ST would continue to succeed in the eighth grade KEA program.  There is sufficient testimony in the record regarding his progress in the KEA program in the sixth and seventh grades, and the likelihood that he could handle the transition.  For example, Ms. Fenster, the Director of Special Education, stated that based on seventh grade data, she and her colleagues had no reason to believe that ST would not succeed in the eighth grade KEA program, and they "certainly wanted to give him that opportunity."  (IHO Hr'g Tr. 81:2–8.) Ms. Fenster also highlighted that MR waived certain services in eighth grade that ST had previously received as support in the sixth and seventh grade KEA program—namely, counseling and social skills intervention assistance.  (*Id.* 92:3–94:4.)  Likewise, ST's special education teacher, Miss Nybro, testified about the factors that the CSE took into consideration in determining that entering the intensive (15:1) class and being supported by KEA was proper. (*See generally id.* 520–43.)  Her testimony reflects that the CSE considered keeping ST in music class, providing ST with Alpha-Smart technology, and supporting him with a teaching assistant

19

who could help streamline his focus and ensure that he received class notes. (*Id.* 520–25.) Miss Nybro also helped refute MR's belief that ST would be better served in the TSP by stating that the TSP was improper for ST because it was geared toward students who "demonstrate[d] a gifted IQ and ha[d] higher achievements in reading and mathematics than S[T] d[id]." (*Id.* 531:8–21.)

Furthermore, when the district saw that the eighth grade KEA program was not accommodating ST's needs, it made myriad modifications to better support ST by reducing his physical education requirement, adding extra periods of math, returning him to the KEA class for math, supplying a bus monitor and a 1:1 teaching assistant, performing a Functional Behavioral Assessment, and drafting a Behavior Intervention Plan. (IHO Decision 4.) Importantly, the district also suggested to MR that it send out-of-district placement packets to locate a proper placement for ST. (*Id.* 4–5.)

Just as the district had to meet its responsibility to find an appropriate out-of-district placement for ST, the district alerted MR that she had a concurrent responsibility to go to the schools with ST to participate in the intake process. The IHO found that MR "did not display a sense of urgency nor did she always bring S.T. with her – a necessary component of the intake process," (*id.* 32), and this finding is amply supported in the record, (*see, e.g.*, *id.* 4–5 (2007–08 out-of-district placement not found "[b]ecause of lack of cooperation by the parent"); *id.* 5 ("mother objected to placement with students classified as emotionally disturbed"); *id.* 6 (family refused to participate in West Nyack's intake process); *id.* 11 (despite several conversations with MR, Irvington Middle School could not schedule intake for ST); *id.* (MR did not make ST available for intake at Haverstraw Middle School). MR did not bring ST to any potential placements until the year was almost over. (D's 56.1 ¶ 44.)

Plaintiffs would like the Court to find that because ST's "eighth grade was a complete disaster," (IHO Decision 23), the CSE's assessment regarding the IEP was necessarily improper, (*see* Ps' Mem. 10–11).  In the absence of a Second Circuit ruling to the contrary, however, this Court looks at the IEP prospectively, not retrospectively, *D.F.*, 430 F.3d at 598, and must give "substantial deference to state administrative bodies on matters of educational policy," *Cerra*, 427 F.3d at 191.  For the reasons set forth above I find that the district has proven by a preponderance of the evidence that the IEP was reasonably calculated to provide ST with a FAPE for the 2007–08 school year.  Moreover, the district attempted to make accommodations for ST and its attempts to obtain an out-of-district placement for him were, at least in significant part, stifled by his mother.[9]

### b.        2008–09 School Year

The IHO held, and the SRO agreed, that the district did not provide ST with a FAPE for the 2008–09 school year because the district failed to carry its burden to show that West Nyack was an appropriate placement.  (IHO Decision 35; SRO Decision 25.)  In so holding, the IHO gave weight to Dr. Kolevzon's opinion that ST could suffer potential psychological harm if he were educated at West Nyack in a group where the students' primary disabilities include emotional disturbances and psychological pathologies, (*see* IHO Decision 35; IHO Hr'g Tr. 1019–22), and stated that the district had failed to present evidence that countered this opinion, (IHO Decision 35).  Despite this finding, however, the IHO determined that "because of delay,

---

[9] Plaintiffs cite *Union School District v. Smith*, 15 F.3d 1519 (9th Cir. 1994), for the proposition that MR's unwillingness to participate in out-of-district placements should not have been determinative in the FAPE analysis. (Ps' Mem. 21 ("'We find that a school district cannot escape its obligation under the IDEA to offer formally an appropriate educational placement by arguing that a disabled child's parents expressed unwillingness to accept that placement.'") (quoting *Smith*, 15 F.3d at 1526).)  The facts of *Smith* differ substantially, however, from those here. Chiefly, in *Smith* the district never even offered the out-of-district placement it claimed was appropriate for the child after the parents had previously expressed a general unwillingness to consider it.  *See Smith*, 15 F.3d at 1526. Conversely, here, the district offered Plaintiffs several options, many of which MR rejected, took issue with, or refused to attend for intake.

objections and [MR's] fixation on the Forum School, M.R. effectively defeated most of the possibilities, leaving limited choice and West Nyack ultimately to be recommended by default," and, thus, Plaintiffs were not entitled to compensatory services. (IHO Decision 35.)[10]  The IHO noted that there appeared to have been programs that were "a better fit for S.T." that were not explored, but because of MR's conduct, including her outright rejection of at least one school, the Summit School, (*see* Parent's Exhibit 77 at 2), ST was not able to be placed in an appropriate program, (IHO Decision at 35).  Accordingly, the IHO's determination that MR's conduct amounted to a veto—decision-making power that the IDEA does not grant to parents, *see T.Y.*, 584 F.3d at 420—was well-grounded.  Furthermore, even if the placements were less than ideal, Plaintiffs did not carry their burden to show that ST would have regressed or received no educational benefits at those schools.  *See Schaffer v. Weast*, 546 U.S. 49, 62 (2005) ("The burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief."); *Cerra*, 427 F.3d at 195 (district court must examine record for "objective evidence" indicating whether the child will make progress or regress under the proposed plan); *see also Rowley*, 458 U.S. at 199 (district need not provide every special service to comply with the IDEA); *Walcak*, 142 F.3d at 132 (IDEA does not require everything for which loving parents might wish for their child).

While this Court sympathizes with the difficulties ST faced in school, the IHO and SRO completed a sound review of the record, which demonstrates that MR's conduct, however well-intentioned, frustrated the district's efforts to obtain a proper out-of-district placement for ST, rendering West Nyack the sole out-of-district placement available for ST.  Although ST was rejected from some schools, MR refused to attend intake sessions, did not take ST with her to

---

[10] ST did not go to West Nyack.  Rather, MR asserted her rights under the IDEA to "stay put" for the 2008–09 school year and have the district continue ST's services under his 2007–08 IEP.  (School District Exhibit IV.F.)

others, and outright rejected programs.  The Court concludes that the SRO properly upheld the

decision of the IHO, and correctly found that the district's denial of a FAPE during 2008–09

school year was due, at least in large part, to MR's conduct during the relevant time period.

Accordingly, this Court agrees with the decisions of both the IHO and SRO below.  The

Court finds that the IHO was correct in her findings regarding whether ST received a FAPE

during the 2007–08 and 2008–09 school years, but that, in any event, as the SRO determined,

these claims are moot.

### C.      Plaintiffs' Claim for Compensatory Education

Finally, even if this case were not moot and even if the denial of a FAPE for 2008–09

was entirely the district's responsibility, Plaintiffs are not entitled to compensatory education.  It

is well-established that under the IDEA, parents are entitled to challenge "any matter relating to

the identification, evaluation, or educational placement of the child, or the provision of a free

appropriate public education to such child."  20 U.S.C. § 1415(b)(6)(A).  Such challenges must

be heard at an impartial due process hearing conducted by the state or local education agency,

*see id.* § 1415(f), and either party may appeal an adverse decision to the appropriate state agency,

*see id.* § 1415(g).  Only after these administrative remedies have been exhausted may an

aggrieved party appeal to a federal or state court, which may then grant appropriate relief.  *See*

*id.* § 1415(i)(2)(A).  One of the matters that must be administratively exhausted in order to be

reviewed in a federal court is the issue of remedies, including whether a child should receive

compensatory education.[11]  *See, e.g.*, *Student X,* 2008 WL 4890440, at *25; *R.C. ex rel. R.J.C. v.*

*Carmel Cent. Sch. Dist.*, No. 06-CV-5495, 2007 WL 1732429, at *5 (S.D.N.Y. June 14, 2007);

---

[11] "'Compensatory education' is prospective equitable relief, requiring a school district to fund education beyond the expiration of a child's eligibility as a remedy for any earlier deprivations in the child's education.  An award of compensatory education is appropriate only for gross violations of the IDEA," *Somoza v. N.Y.C. Dep't of Educ.*, 538 F.3d 106, 109 n.2 (2d Cir. 2008) (citation omitted), for example, where a child was actually educated under an inadequate IEP, *Brennan v. Reg'l Sch. Dist. No. 1 Bd. of Educ.*, 531 F. Supp. 2d 245, 265 (D. Conn. 2008).

*Michaels v. Mills*, No. 02-CV-0555E, 2004 WL 816918, at *3 (W.D.N.Y. Feb. 14, 2004); *Essen v. Bd. of Educ. of Ithaca City Sch. Dist.*, No. 92-CV-1164, 1996 WL 191948, at *6 (N.D.N.Y. Apr. 15, 1996).

Plaintiffs in this case failed to include a request for compensatory education in their due process complaint, (*see* SRO Decision 23–24), and therefore the request for such relief was not before the IHO.  In any event, the IHO stated that because of MR's conduct—which frustrated the district's ability to locate an appropriate out-of-district placement—ST was not entitled to compensatory education for not receiving a FAPE during the 2008–09 school year.  (IHO Decision 35.)  On appeal, the SRO agreed that ST was not entitled to compensatory education, but so held for different reasons—namely, because Plaintiffs had not made the request in their due process complaint, and only added the request for such services in their closing brief to the IHO in order to evade dismissal of their claims as moot.  (*See* SRO Decision 23–26.) Furthermore, Plaintiffs had not requested to amend their due process complaint to add this form of relief, which they could have done anytime during the pendency of the seven-month IHO hearing.  (*See id.* 24.)

On appeal to this Court, Plaintiffs argue that they filed the due process complaint seeking a placement for ST, not compensation for deprivation of services, but that the district caused the IHO hearing to drag on throughout the school year, and the relief they sought changed as a result.  (Ps' Mem. 17.)  Furthermore, MR argues that despite her lack of "foresight" to request compensatory education up front, this Court should craft an equitable remedy and not "unjustly punish[]" ST "due to alleged parental non-cooperation."  (*Id.* 19–20.)  Defendant states that Plaintiffs are statutorily barred from bringing the compensatory education claim because they failed to exhaust their administrative remedies below.  (*See* D's Mem. 8–14.)

24

As the SRO held, Plaintiffs failed to exhaust their administrative remedies on their claim for compensatory education.  (SRO Decision 23, 25–26.)  Although Plaintiffs argue that they had no reason to request compensatory education when they filed the complaint, and the protracted length of the IHO hearing was the reason they later requested this remedy in their closing brief to the IHO, these arguments are without merit.  Plaintiffs made their demand for a due process hearing on September 11, 2008 based on, among other things, an inappropriate IDEA classification, failure to provide a FAPE during the 2007–08 school year that had already passed, and an unsuitable IEP and services for the pending 2008–09 school year.  (*See* School District Ex. I.A.)  Because Plaintiffs' claims related to failure to place ST in an appropriate program and classification for a year that had already ended, and an anticipated similar failure and lack of proper services for the upcoming year, compensatory education would have been an appropriate form of relief for Plaintiffs to seek at the outset of their case.  *See P. v. Newington Bd. of Educ.,* 546 F.3d 111, 123 (2d Cir. 2008) ("[W]e have held compensatory education is an available option under the Act to make up for denial of a free and appropriate public education.").  It was incumbent upon Plaintiffs to administratively exhaust any claim for relief they believed could provide ST with the education that they thought he needed.  *See Student X*, 2008 WL 4890440, at *25–26 (barring plaintiff from receiving compensatory education to the extent that she failed to seek such relief in the administrative proceedings).  Moreover, while the IHO hearing in this case took longer than usual, there is no indication in Plaintiffs' moving papers that the time frame was so extended as to have been unimaginable.  Both parties agreed to extensions and adjournments of the IHO hearing, and Plaintiffs had ample time over the seven months to amend their complaint to request compensatory services.  (*See* SRO Decision 24.)  Finally, there is a statutory bar to the IHO considering issues not raised in the demand for a due process hearing, *see* 20

U.S.C. § 1415(f)(3)(B), absent the district's or IHO's consent to a timely amendment, *see id.* §

1415(c)(2)(E); 34 C.F.R. § 300.508(d)(3).  Accordingly, this Court is constrained to conclude

that Plaintiffs' request for compensatory education is improper for failure to exhaust

administrative remedies.[12]

## IV.    CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment is GRANTED,

and Plaintiff's Cross-Motion for Summary Judgment is DENIED.  The Clerk of the Court is

respectfully directed to terminate the pending motions, (Docs. 8, 13), and close the case.

SO ORDERED.

Dated: December *16*, 2011
       White Plains, New York

_____
       CATHY SEIBEL, U.S.D.J.

---

[12] I thus need not address the SRO's alternative conclusion that the record did not reflect a deprivation of educational services that caused harm and could be rectified by compensatory services.  (SRO Decision 24, 26.)

26